# UNITED STATES BANKRUPTCY COURT
# MIDDLE DISTRICT OF FLORIDA
# ORLANDO DIVISION

In re:

GOLDEN GEM GROWERS, INC.,            Case No. 6:01-bk-09028-ABB
                                                        Chapter 11
     Debtor.
_____/

GOLDEN GEM GROWERS, INC.,

     Plaintiff,                                  Adv. Pro. No. 6:07-ap-00095-ABB

vs.

WALTER FERGUSON,

     Defendant.
_____/

## MEMORANDUM OPINION AND ORDER

This matter came before the Court on the Complaint (Doc. No. 1) filed by Golden Gem Growers, Inc., the Plaintiff and Debtor herein ("Plaintiff"), against the Defendant Walter Ferguson ("Defendant"). An Order was entered on September 30, 2009 (Doc. No. 46) granting Plaintiff's Motion for Partial Summary Judgment (Doc. No. 34) and setting an evidentiary hearing to establish damages.

The evidentiary hearing on damages was held on November 19, 2009 at which the Defendant, his counsel, Plaintiff's counsel, and Daniel E. Dempsey ("Dempsey"), the Plaintiff's Disbursing Agent, appeared. The parties, pursuant to the Court's directive, filed closing briefs and Defendant filed Objections to Plaintiff's Trial Exhibits (Doc. Nos. 56, 59, 60, and 61).

Damages of $53,422.67 are due to be awarded to Plaintiff and against Defendant for the reasons set forth herein. The Court makes the following findings of fact and conclusions of law after reviewing the pleadings and evidence, hearing live argument and testimony, and being otherwise fully advised in the premises.

*Post-Trial Exhibit Objections*

Defendant objected at trial to the admission of attachment C of Plaintiff's Exhibit 1 and Exhibit 8, which are summaries of Plaintiff's business records of its final returns for the 2000-2001 growing season. His various objections were overruled and the exhibits were admitted into evidence. Defendant renewed his objections and requested he be allowed to cross-examine Dempsey. The Court allowed Defendant to cross-examine Dempsey and move to strike the evidence at the conclusion of the cross-examination. Defendant completed the cross-examination and failed to request Plaintiff's Exhibits 1 and 8 be stricken.

Defendant, post-trial, filed the Objections to Plaintiff's Trial Exhibits (Doc. No. 56) asserting Plaintiff's Exhibits 1 *and 3* are not admissible because: (i) an unknown attorney prepared them and did not testify as to the underlying calculations pursuant to Federal Rule of Evidence 1006; and (ii) the documents were prepared for the purpose of litigation and do not constitute records of regularly conducted business activity pursuant to Federal Rule of Evidence 803(6). He reiterates these objections in his post-hearing brief (Doc. No. 61).[1]

---

[1] Defendant erroneously refers to Plaintiff's Exhibit 3 in his Objections. The exhibits at issue in Defendant's Objections are Attachment C to Plaintiff's Exhibit 1 and Plaintiff's Exhibit 8. Plaintiff identified Exhibit 3 at trial, but did not offer Exhibit 3 in evidence. Plaintiff's failure to offer Exhibit 3 in evidence is moot because Exhibit 3 is identical to Attachment C of Exhibit 1.

2

Defendant had ample opportunity to object to the exhibits before and during the trial. Plaintiff, on September 30, 2009, filed and served on Defendant a Notice of Intent to Use Summaries (Doc. No. 48) with copies of Exhibits 1 (attachments B, C, and D) and 8 attached. Defendant did not respond to the Notice of Intent to Use Summaries. Defendant's objections contained in his Objections to Plaintiff's Trial Exhibits and post-hearing brief are hereby overruled and Plaintiff's Exhibits 1 and 8 remain admitted as evidence.

### *Background and Parties' Positions*

This matter arises from Plaintiff's breach of contract action against Defendant, who is a Florida citrus grower and was a former member of Plaintiff's agricultural cooperative association. Defendant, who is eighty-six, owns an orange grove in Glades County, Florida and continues to work at the grove.

The background facts are set forth in detail in the Court's September 30, 2009 Memorandum Opinion and Order (Doc. No. 46) in which the Court, on the parties' cross-summary judgment motions, determined Defendant Walter Ferguson is liable to Plaintiff for the citrus fruit advances paid by Plaintiff for his oranges during the 2000-2001 growing season in excess of his *pro rata* portion of the members' final pool returns. Neither party sought reconsideration of the September 30, 2009 Order.

The issues for determination at this final stage of this proceeding are: (i) the amount of damages recoverable by Plaintiff from Defendant; and (ii) whether Defendant is entitled to set off the recoverable damages against his capital equity credits.

Plaintiff asserts in its Complaint it paid Defendant advances that exceeded Defendant's pool returns by $54,395.56. Plaintiff seeks recovery of the alleged excess of $54,395.56, plus its attorneys' fees and costs incurred in this action.

Defendant asserts no sums are owed to Plaintiff because: (i) Plaintiff's documentation does not support the specific amounts it asserts were paid as advances on Defendant's behalf; and (ii) Defendant had capital equity credits totaling $125,820.00 as of April 20, 2001 and any amounts owed by him for excess advances should be deducted from such capital equity credits. Defendant, pursuant to paragraph 12 of the Revised Grower Member Agreement and unspecified Florida law, requests recovery of his reasonable attorneys' fees and costs.

*Governing Law and Burden of Proof*

Plaintiff instituted numerous breach of contract actions against other members of the cooperative for recovery of excess advances including Nelson & Company, Inc. in Golden Gem Growers, Inc. v. Nelson & Company, Inc., Adv. Pro. No. 6:04-ap-00031-ABB (the "Test Case"). Plaintiff sought recovery of alleged excess advances of $148,083.44 from Nelson & Company, Inc. The excess advance figure was calculated based upon deductions that included Plaintiff's bankruptcy reorganization expenses, of which Plaintiff's attorneys' fees and costs were a component. The Court held in the Test Case reorganization expenses do not constitute proper deductions and disallowed the deduction of all reorganization expenses.

The Memorandum Opinion and Judgment entered by the Court on March 1, 2006 in the Test Case in favor of Plaintiff and against Nelson & Company, Inc. constitute a

4

final judgment on the merits[2] and are controlling in this proceeding pursuant to the doctrines of stare decisis and law of the case. Holloway v. John Hancock Mut. Life Ins. Co. (In re Holloway), 81 F.3d 1062, 1069 (11th Cir. 1996); Wallis v. Justice Oaks II, Ltd. (In re Justice Oaks, II, Ltd.), 898 F.2d 1544, 1549 n.3 (11th Cir. 1990).

The underlying contracts governing the relationship between Plaintiff and Defendant Walter Ferguson are the Revised Grower Member Agreement dated January 18, 1989, the Addendum thereto dated July 20, 1994, and the Debtor's Amended Bylaws dated October 31, 1994 ("Bylaws"), which were incorporated into and made a part of the Revised Grower Member Agreement (Pl's Ex. 13) (collectively, "Agreements"). These contracts are governed by Florida State law pursuant to Paragraph 16 of the Revised Grower Member Agreement.

Plaintiff, to prevail on its breach of contract action pursuant to Florida State law, must establish by a preponderance of the evidence:

(1) the existence of a contract;

(2) a material breach of that contract; and

(3) damages resulting from the breach.

Knowles v. C.I.T. Corp., 346 So.2d 1042, 1043 (Fla. 1st DCA 1977) (per curiam); Test Case Memorandum Opinion at 10.

Plaintiff, pursuant to the September 30, 2009 Order, has established by a preponderance of the evidence the first and second elements of its breach of contract

---

[2] Defendant Nelson & Company, Inc. appealed the Test Case Memorandum Opinion and Judgment to the United States District Court for the Middle District of Florida, Orlando Division, and subsequently moved to dismiss the appeal in Nelson & Company, Inc. v. Golden Gem Growers, Inc., Case No. 6:06-cv-405-Orl-22DAB. The District Court entered an Order of Dismissal dismissing the appeal on September 26, 2006.

action. The remaining issue for determination is whether it has established damages resulting from such breach by Defendant Walter Ferguson.

### *Excess Advances Calculation*

Plaintiff, in support of its damages claim, presented documentary evidence and the testimony of Dempsey. Plaintiff primarily relies upon Exhibit 8, which is an itemized summary of the final returns for each member for the 2000-2001 growing season. Exhibit 8 lists:

(i)   each member of the cooperative;

(ii)  the variety of citrus the member grew;

(iii) the weight in pounds of solid citrus picked;

(iv)  Final Pool Rates;

(v)   Final Pool Returns;

(vi)  pick and haul advances paid by Plaintiff;

(vii) Post Harvest Advances paid by Plaintiff;

(viii) Capital Equity Credits;

(ix)  Grove Care charges;

(x)   Other Charges Plaintiff paid on behalf of the grower such as unloading charges or inspection fees;

(xi)  Total Deductions representing the tally of: all advances, Capital Equity Credits, Grove Care, and Other Charges;

(xii) the difference between the Final Pool Returns less Total Deductions; and

(xiii) the net amount owed to Plaintiff representing the total Final Pool Returns less Total Deductions.[3]

---

[3] The columns Unpaid Fresh Fruit Pools & Other, Refund Fla. Citrus Mutual, and Prior Year's Over Advances are not included herein because they have zero values for the Defendant and are not relevant to this proceeding.

6

Defendant is listed as Member Number 1326-1 in Exhibit 8 and he supplied three varieties of oranges to Plaintiff during 2000-2001: (i) Early & Middle Premium designated "E/M"; (ii) Valencia Premium designated "VA"; and (iii) Navel Non-premium designated "Elim Nav." Exhibit 8 reflects Defendant supplied 119,285.89 pounds of Early Middle oranges, 117,256.77 pounds of Valencia oranges, and 2,783.70 of Navels.

Plaintiff calculated Defendant's Final Pool Returns based upon the Final Pool Rates of 19.74 cents per pound for the Early & Middle oranges, 23.68 cents per pound for the Valencia oranges, and 3.98 cents per pound for the Navel oranges (solid pounds x Final Pool Rates = Final Pool Returns):

| Variety | Pounds | Final Pool Rates | Final Pool Returns |
| --- | --- | --- | --- |
| E/M | 119,285.89 | 0.1974 | $23,547.03 |
| VAL | 117,256.77 | 0.2368 | 27,766.40 |
| ELIM NAV | 2,783.70 | 0.0398 | 110.79 |
| Total Final Pool Return: | | | $51,424.22 |

Plaintiff, through a long-standing employee utilizing the same methodology Plaintiff had used for ten years, calculated the pool rates for each variety of citrus based upon annual revenues from citrus processing and operating expenses (Pl's Ex. 1). The pool rates for the 2000-2001 growing season were low due to a 43% lower volume of fruit processed and operating expenses that only slightly decreased (Id.). Plaintiff adjusted the pool rates to reflect the rates established in the Test Case, which disallowed the inclusion of Plaintiff's reorganization expenses. Pl's Ex. 8; Test Case Memorandum Opinion at p. 7.

Defendant, pursuant to the Revised Grower Member Agreement, elected to be paid by the "Premium Return/Standard Payment" method and not the "Accelerated Payment/Standard Return" method (Pl's Ex. 13). The pool rates applied to Defendant's harvested citrus are based upon this election.

From Defendant's Total Final Pool Return of $51,424.22, Plaintiff deducted the costs of picking and hauling the fruit, Capital Equity Credits, and other charges:

| | |
|---|---:|
| Picking and hauling advances: | $87,544.84 |
| Post-harvest advances: | 972.90 |
| Capital Equity Credits: | 8,798.75 |
| Other charges: | 8,503.30 |
| Total deductions: | $105,819.79 |

Plaintiff asserts it incurred total expenses of $105,819.79 relating to Defendant's citrus during the 2000-2001 growing season. The total deductions of $105,819.79 for Defendant's fruit exceed Defendant's $51,424.22 *pro rata* share of the pool returns by $54,395.57.

Plaintiff originally sought to recover an excess advance of $85,055.65 from Defendant pursuant to its 2002 demand letter (Pl's Ex. 1). The excess advance amount of $54,395.57 in Exhibit 8 represents the recalculated excess advance total based upon Plaintiff's elimination of its reorganization expenses pursuant to the Test Case.

### *Defendant's Objections to Calculations*

Defendant contests several entries in Plaintiff's Exhibit 8.

**<u>Pick and Haul Advances:</u>** Exhibit 8 sets forth Plaintiff incurred picking charges of $66,446.13 and hauling charges of $21,098.71, for a total of $87,544.84, for Defendant's Early & Middle and Valencia oranges. Plaintiff presented copies of cancelled checks for sums paid to Texas Express, Inc. which provided the picking and

hauling services for Defendant's fruit (Pl's Ex. 5). Each cancelled check is accompanied by a supporting Contractor Statement detailing on a daily basis the number of boxes of fruit picked, the harvest rate, the road rate for hauling, and total picking and hauling charges (Id.).

The hauling charges of $21,098.71 are based upon the number of boxes of fruit picked from Defendant's grove and one-way zone mileage rates. It was the parties' standard protocol that partial loads of fruit were charged as full loads. Dempsey verified the accuracy of the hauling charge rates through a MapQuest analysis.

Defendant disputes the accuracy of the charges, but did not present any evidence contradicting their accuracy. Defendant admitted Plaintiff provided picking and hauling services for Defendant's Early & Middle and Valencia oranges and advanced sums for such services. Defendant filed a proof of claim, Claim No. 319-1, in which he concedes Plaintiff incurred picking and hauling charges of $87,544.84:

> Total amount of claim at time case filed: $212,685.49 fair market value of citrus fruit sold in the 2000-2001 citrus market, minus $87,544.84 picking and hauling charges, for an amount due of $125,140.65.

Pl's Ex. 11.

Plaintiff routinely deducted Defendant's pick and haul costs from Defendant's *pro rata* share of the pool returns pursuant to the Revised Grower Member Agreement, the Bylaws and the parties' course of dealings. Plaintiff established by a preponderance of the evidence it paid third parties $87,544.84 for the picking and hauling of Defendant's oranges during the 2000-2001 growing season. Such payments constitute advances and are recoverable damages. Test Case Memorandum Opinion at pp. 7-8.

*Navel Oranges:* Defendant asserts Plaintiff was not authorized to advance $972.90 post-harvest for the "ELEM/NAV" navel oranges because that variety of orange is not specifically included in the Revised Grower Member Agreement and Plaintiff incurred no expenses regarding the navel oranges Defendant grew in 2000-2001. Defendant testified twenty acres of his grove are navel orange trees and he harvested and sold the navels on the market for cash with no involvement by Plaintiff. His testimony was credible.

The Revised Grower Member Agreement provides at page 1: "INCLUDED IN AGREEMENT: 150 Acres of Pineapple, Valencia, and Hamlins" and "Member retains option to further negotiate harvesting of 20 acres of Washington Navels." The Pineapple, Valencia, and Hamlins varieties constitute "early middle" citrus. The parties did not execute an addendum to the Revised Grower Member Agreement for navels.

The plain and unambiguous language of the Revised Grower Member Agreement does not include "ELIM NAV" navel oranges. Exhibit 8 reflects Plaintiff was not involved in the picking and hauling of the navels. Plaintiff conceded the parties did not have a contract for navels and the $972.90 post-harvest advance is unsubstantiated. Plaintiff is not entitled to the $972.90 deduction contained in Plaintiff's Exhibit 8.

*Capital Equity Credits:* Defendant asserts Plaintiff's deduction of $8,798.75 for Capital Equity Credits is unauthorized and constitutes "double-dipping." Article VII, Section 1 of the Bylaws provides:

> For the purpose of acquiring and maintaining adequate capital to finance its business, the Association is authorized to deduct such sums, as may from time to time be established by the Board of Directors, from those proceeds due to the member by the Association, and to issue to member and non-member patrons, capital credits of the character hereinafter described to evidence capital furnished by such patrons. Capital credits

> shall be issued for per unit capital retains and for patronage dividends not paid in cash. Funds arising from the issue of such credits shall be used for creating a revolving fund for the purpose of building up such an amount of capital as may be deemed necessary by the Board of Directors from time to time and for revolving such capital. Such credits shall be issued in annual series, each credit in each series being identified by the year in which it is issued; and each series shall be retired fully or on a pro rata basis, only at the discretion of the Board of Directors of the Association, in the order of issuance by years as funds are available for that purpose. No interest shall be paid on capital credits.
> . . .
> All debts of the Association, both secured and unsecured, shall be entitled to priority over all outstanding capital credits.

Pl's Ex. 13. Paragraph 3.B. of the Revised Grower Member Agreement Addendum provides:

> MEMBER elects present <u>CONTINUING SEASONAL MARKETING AGREEMENT TERM</u>. This contract term carries over from season to season unless cancelled by either party by giving written notice during the month of July and as otherwise provided for in Paragraph 4 of the Agreement. The Capital Equity Credit rate for this election shall be <u>$.25</u> per box. Thereafter, the rate set by the Board of Directors from time to time shall be effective.

Pl's Ex. 13. Defendant elected the Continuing Seasonal Marketing Term (Pl's Ex. 13, Addendum at p. 2). The parties did not cancel this contract term.

Plaintiff deducted $4,490.75 and $4,308.00 from Defendant's 2000-2001 final pool returns as capital equity credits for the purpose of acquiring and maintaining adequate capital to finance its operations (Pl's Ex. 8). The capital equity credit deductions comport with the Defendant's continuing seasonal marketing term election: (i) 17,963 boxes of Early & Middle oranges x $.25/box = capital equity credits of $4,490.75; and (ii) 17,232 boxes of Valencia oranges x $.25/box = capital equity credits of $4,308.00 (Pl's Ex. 3, 8, 13).

11

Plaintiff was authorized to deduct the capital equity credits totaling $8,798.75 pursuant to Paragraph 3.B. of the Addendum and Article VII, Section 1, of the Bylaws. Test Case Memorandum Opinion at p. 16 ("Golden Gem had the right to deduct Equity Credits from any pool returns it owed to Nelson for the Fiscal Year 2001 . . . .").

***Other Charges:*** Plaintiff's Exhibit 8 reflects Plaintiff paid "Other Charges" of $8,503.30 relating to Defendant's Early & Middle and Valencia oranges. Dempsey explained these advanced expenses are comprised of industry assessments to the Florida Department of Citrus and U.S. Department of Agriculture and unloading fees. These are miscellaneous expenses that were regularly incurred in Plaintiff's operations and charged to the growers. These expenses are uncontroverted.

Plaintiff has established by a preponderance of the evidence it paid third parties $8,503.30 for assessments and unloading fees relating to Defendant's oranges during the 2000-2001 growing season. Such payments constitute advances and are recoverable damages. Test Case Memorandum Opinion at pp. 7-8.

### *Setoff of Capital Equity Credits*

Defendant accumulated capital equity credits of $125,820.00 during his membership in the cooperative association. He asserts any excess advances due and owing to Plaintiff must be set off against his capital equity credits. He contends Plaintiff is not entitled to any recovery against him since his capital equity credits exceed the excess advances. Plaintiff asserts no right of setoff exists pursuant to the parties' Agreements and their established course of dealing. The issue of setoff of capital equity credits was not raised or adjudicated in the Test Case.

Defendant's capital equity credits of $125,820.00 accrued throughout his membership in the cooperative pursuant to Paragraph 10 of the Revised Grower Member Agreement, Paragraph 3.B. of the Addendum, and Article VII of the Bylaws. Paragraph 10 of the Revised Grower Member Agreement provides:

> The MEMBER shall acquire *his pro-rata share of facility ownership* through annual accrual of Capital Equity Credits. The MEMBER agrees to accept Capital Equity Credits of the COOPERATIVE as part payment for this citrus fruit, in such amount as may be fixed by the Board of Directors of the COOPERATIVE on a fiscal yearly basis.

Pl's Ex. 13 (*emphasis added*). Paragraph 10 of the Bylaws provides:

> For the purpose of acquiring and maintaining adequate capital to finance its business, the Association is authorized to deduct such sums, as may from time to time be established by the Board of Directors, from those proceeds due to the member by the Association, and to issue to member and non-member patrons, *capital credits* of the character hereinafter described to evidence capital furnished by such patrons. . . .
> . . .
> *All debts of the Association, both secured and unsecured, shall be entitled to priority over all outstanding capital credits.*

Pl's Ex. 9 (*emphasis added*).

Plaintiff treated the members' capital equity credits as equity in its audited financial statements and in its course of dealings with the members, which treatment is consistent with the plain and unambiguous language of the Agreements. Plaintiff's Balance Sheets for August 31, 1999 and 1998 list total capital equity credits of $27,539,216.00 for 1999 and $26,078,606.00 for 1998, which are characterized as "Patron's equity" (Pl's Ex. 10). The capital equity credits are not treated as liabilities in Plaintiff's financial statements.

The capital equity credits bear no interest, have no due date, may be revolved, and may be repaid to the members within the sole discretion of the Board of Directors

pursuant to plain and unambiguous language of Article VII, Section 1 of the Bylaws (Pl's Ex. 9). Dempsey testified the Board of Directors did not authorize any payment of capital equity credits to members during the 2000-2001 growing season and the last time the Board of Directors had authorized a payment of capital equity credits was in the 1970s.

A member's accrued capital equity credits constitute an ownership interest in the cooperative and not a debt owed by the cooperative to the member pursuant to the plain and unambiguous language of the Bylaws, the Revised Grower Member Agreement, and the Addendum (Pl's Exs. 9, 13). Courts have uniformly held capital equity credits in an agricultural cooperative association do not constitute an indebtedness of the cooperative, but constitute ownership interests in the cooperative and cannot be used as a setoff against a member's indebtedness:

> It is well-established that 'equity credits allocated to a patron on the books of a cooperative do not reflect an indebtedness which is presently due and payable by the cooperative to such patron. Such equity credits represent patronage dividends which the board of directors of a cooperative . . . has elected to allocate to its patrons, not in cash or other medium of payment, which would immediately take such funds out of the working capital of the cooperative, but in such manner as to provide or retain capital for the cooperative and at the same time reflect the ownership interest of the patron in such retained capital . . . Therefore, equity credits cannot be used as a setoff against a member's present indebtedness to the association.'

Howard v. Eatonton Co-op. Feed Co., 177 S.E.2d 658, 791-92 (Ga. 1970) (*quoting* 18 AM. JUR. 2d 275 *Cooperative Associations* § 15); Atchison County Farmers Union Co-op Ass'n v. Turnbull, 736 P.2d 917, 921 (Kan. 1987) ("A member or stockholder of a cooperative association is bound by the bylaws and cannot contend that when equity credits are allocated upon the books of the association that an indebtedness is created

14

which can be used as a setoff against a debt the member or stockholder owes the association.").

No provision in the Bylaws, Revised Grower Member Agreement, or Addendum grants the members a right to set off of debts owed to the cooperative against their capital equity credits. The Bylaws grant setoff and lien rights to the cooperative only:

> The Association shall be entitled to set off against any claims which it may have against any member, *any amounts which the Association may owe the member*, and the Association shall have a lien on all unexhausted amounts that may be allocable or that may have been allocated to any member pursuant to this Article and it may subject any such amounts to the payment of any claims of the Association against any member.

Pl's Ex. 9, Article VII, § 4 (*emphasis added*). Plaintiff, pursuant to the plain and unambiguous language of Section 4, "may" set off any claims it has against the Defendant against "any amounts which the Association may owe the member." Defendant's capital equity credits do not constitute an indebtedness owed by Plaintiff to Defendant ("any amounts which the Association may owe"), but constitute Defendant's ownership interest. Howard v. Eatonton Co-op. Feed Co., 177 S.E.2d at 791-92. Section 4 allows for a setoff right only where a member is indebted to Plaintiff and does not relate to capital equity credits. Section 4 does not authorize or require Plaintiff to set off its excess advances claim against Defendant's capital equity credits, nor does it create a setoff right in favor of Defendant.

Defendant asserts Section 5 of Article VII of the Bylaws entitles him to set off the excess advances against his capital equity credits, which provides:

> In the event the Association suffers a loss in any fiscal year in handling members' products or in the sale of supplies to or rendering of services, the Board of Directors shall have full authority and discretion to handle such loss so that it will be borne by members in the manner determined by the Board to be most equitable and practicable. Without limitation upon

the authority hereby conferred, such loss may be charged off against the capital contributions of members for the year in which the loss occurred, and if such loss is not fully absorbed in this manner the balance may be charged pro rata against a member's oldest outstanding qualified capital credits to the extent thereof and then to the member's oldest outstanding nonqualified capital credits. Any unabsorbed loss after the exhaustion of all outstanding capital credits may be charged against capital credits and/or net margins of future years resulting from business handled with members and nonmembers.

Pl's Ex. 9. Section 5, pursuant to its plain and unambiguous language, is inapplicable. It pertains to an operational loss suffered by Plaintiff in a fiscal year and for which the Plaintiff, in its sole discretion, may call upon the members to absorb pro rata by charging the loss off against their capital contributions. Section 5 does not authorize or require Plaintiff to set off an excess advances claim against Defendant's capital equity credits.

No provision in the Revised Grower Member Agreement, Addendum, or Bylaws grants Defendant a right to set off Plaintiff's excess advances against his capital equity credits. Defendant has no right of setoff.

### *Attorneys' Fees*

Both parties request an award of attorneys' fees and costs. A litigant may recover attorney's fees and costs only where such an award is provided for by enforceable contract or statute. <u>Alyeska Pipeline Serv. Co. v. Wilderness Soc'y</u>, 421 U.S. 240, 257 (1975). The Court shall retain jurisdiction to consider an award of appropriate attorneys' fees and costs upon a specific award request made by either party.

### *Conclusion*

Plaintiff has established by a preponderance of the evidence it made total advances of $104,846.89 for Defendant's fruit and Defendant received a final pool return of $51,424.22 for the 2000-2001 growing season. Plaintiff has established by a

preponderance of the evidence it paid excess advances of $53,422.67 for the fruit, which it is entitled to recover from Defendant pursuant to the binding contractual provisions of the Revised Grower Member Agreement, Addendum, and Bylaws and the rulings of the Test Case.

Defendant is not entitled to set off the excess advances against his capital equity credits. Defendant owes Plaintiff the amount of $53,422.67. Judgment is due to be entered in favor of the Plaintiff and against the Defendant in the amount of $53,422.67.

Accordingly, it is

**ORDERED, ADJUDGED and DECREED** that the Court hereby reserves jurisdiction to consider an award of appropriate attorneys' fees and costs upon a specific award request made by either party.

A separate Judgment consistent with these findings of fact and conclusions of law shall be entered contemporaneously.

Dated this 2nd day of March, 2010.

_____
ARTHUR B. BRISKMAN
United States Bankruptcy Judge